Filed 12/6/21  D.M. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| D.M. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF ORANGE COUNTY, <br><br> Respondent; <br><br> ORANGE COUNTY SOCIAL SERVICES AGENCY et al., <br><br> Real Parties in Interest. | G060599 <br><br> (Super. Ct. No. 20DP0271) <br><br> O P I N I O N |

Original proceedings; petitions for a writ of mandate to challenge orders of the Superior Court of Orange County, Mary Kreber Varipapa, Judge. Petitions denied.

Arthur J. LaCilento for Petitioner D.M.

Donna P. Chirco for Petitioner S.M.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Jess Ann Hite for Real Party in Interest A.M.

\* \* \*

## INTRODUCTION

In early 2020, then three-year-old A.M. and then three-month-old C.M. were taken into protective custody after their mother S.M. (Mother) called 911 and reported that C.M. had been found inexplicably unresponsive in the family's home. After C.M. was rushed to the hospital, he was placed on life support. Life support was removed a few days later after C.M. suffered both brain and cardiac death.

An autopsy confirmed C.M. had suffered multiple fractures to bones throughout his body. Some of the fractures were in various stages of healing, showing C.M. had been injured weeks before he had been admitted to the hospital. The pathologist who conducted the autopsy concluded C.M.'s cause of death was a traumatic brain injury.

The juvenile court sustained the allegations of the amended juvenile dependency petition filed by the Orange County Social Services Agency (SSA) on behalf of A.M. The petition alleged that, inter alia, Mother and the children's father D.M. (Father) (sometimes referred to collectively as the parents) had caused another child's death within the meaning of Welfare and Institutions Code section 300, subdivision (f) (section 300(f)).[1] The juvenile court also found the parents had caused C.M.'s death through abuse or neglect within the meaning of section 361.5, subdivision (b)(4), denied reunification services, and set a permanency hearing. The parents each filed a petition for

---

[1]  All further statutory references are to the Welfare and Institutions Code.

a writ of mandate challenging the court's jurisdiction and disposition orders (collectively the petitions). A.M.'s counsel filed a notice of joinder in SSA's opposition to Mother's and Father's writ petitions.

We deny the petitions. Substantial evidence showed C.M. had been solely in the care and custody of Mother and Father during his short life, and neither parent was able to provide any information that would explain his fatal traumatic brain injury or the several fractures he had suffered in the weeks before his death. Under these circumstances, it was not necessary for the juvenile court to determine whether it was Mother, Father, or both, who directly inflicted C.M.'s injuries. Substantial evidence supports the juvenile court's findings that both Mother and Father, as C.M.'s sole caretakers, caused C.M.'s death through their abuse or neglect by a preponderance of the evidence under section 300(f) and by clear and convincing evidence under section 361.5, subdivision (b)(4).

We also reject Father's argument the trial court denied him due process by admitting a 74-page addendum report in the middle of the jurisdiction hearing. The record shows Father rejected the trial court's offer to continue the hearing to permit Father to review the material and conduct further discovery in the matter. In any event, Father has failed to show how any error in admitting the report was prejudicial.

## FACTS AND PROCEDURAL HISTORY

### I.

#### ALLEGATIONS OF THE AMENDED JUVENILE DEPENDENCY PETITION

In March 2020, SSA filed an amended juvenile dependency petition on behalf of A.M., alleging she came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (f) (caused another child's death through abuse or neglect), and (j) (abuse of a sibling).

As again amended by interlineation in June 2021 to conform to proof, the petition alleged as follows. A.M. and C.M. lived with Mother and Father. Mother was the primary caregiver of both children during the day and Father was C.M.'s primary caregiver at night. On February 26, 2020, C.M. was transported to the hospital because he had been found unresponsive in the home. He had been without oxygen and/or without a pulse for approximately 40 minutes before he regained a pulse through lifesaving measures, and he was placed on life support.

A CT scan and an X-ray showed C.M. had suffered fractures to the left lateral ribs, one and possibly more fractures to the right anterior ribs, a transverse fracture of the left ulna by the elbow (bone of the forearm), a hematoma on the back of the head, and a significant bruise on the inside of his right ear. Swelling in C.M.'s brain had pulled apart the skull bones at the suture lines.

According to medical personnel, C.M. had experienced at least two separate incidents of significant injury. The first incident occurred two to four weeks before he was hospitalized, at which time he suffered at least seven and as many as 10 different fractures. The second injury occurred on February 26, 2020 when C.M. went into cardiac arrest.

On March 1, 2020, C.M.'s first brain scan showed no brainstem reflexes. On March 2, C.M. was declared brain dead and on March 4, his cardiac death was declared.

The amended petition further alleged: "Competent medical opinion is that the fractures to the sibling, C[.M.], especially the rib fractures are consistent with non-accidental trauma. The fractures were not caused by CPR to the sibling on February 26, 2020, as the injuries were in healing stages and would have taken 10-14 days to present. The injuries would not have been caused by the sibling's birth, as the fractures were approximately two to four weeks old and could not have been caused three months ago. Further, the injuries would have been painful to the sibling when they

4

occurred and the sibling would have been showing symptoms two to three weeks prior. The hematoma would typically be caused by blunt force trauma; the hematoma did not cause the brain swelling. The sibling had no obvious signs of a bone disorder and no medical cause has been found for the sibling's injuries. [Mother] and [Father] have no explanation for the sibling's injuries other than an incident sometime in February 2020 in which [Father] reported that he tripped over the dog while holding the sibling, and they fell, with the sibling hitting the couch, [Father]'s weight falling on the sibling, and the sibling falling to the floor. According to medical person[nel], this account would not explain the sibling's injuries. The parents also have no explanation for the sibling's fatal injuries."

The petition further alleged that, pursuant to section 355.1, the injury sustained by C.M. "is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor."

## II.

### SSA'S REPORTS AND THE JURISDICTION HEARING

In the jurisdiction and disposition report, SSA recommended the juvenile court sustain the amended petition, declare dependency, deny reunification services to Mother and Father, and set a permanency hearing. We summarize information relevant to the issues on appeal that is contained in the multiple reports prepared by SSA and admitted into evidence at the jurisdiction hearing as follows.

Mother and Father, who are married, lived in their home with A.M. and C.M.; no other adult or child lived with them. Mother and Father shared childcare responsibilities: Mother would take care of the children during the day and Father would do the nighttime feedings for C.M. because Mother would get migraine headaches if she did not get enough sleep.

5

Mother stated the family followed its normal routine the night of February 26, 2020. Mother made dinner while C.M. napped and Father was on his way home from work. Mother noted that while Father had been at work that day, he "added a girl on Instagram" and that Mother had sent him a text telling him they had to discuss it when he got home. She stated they discussed the issue after Father got home but did not have an argument. After dinner, Mother gave C.M. to Father and she put A.M. to bed.

Mother and Father stated that after Father fed C.M. a bottle, C.M. vomited. Father took C.M.'s temperature and told Mother that it was low but within the normal range. Father put C.M. to sleep and came out to the living room. After C.M. woke up, Father went to attend to him. About 15 minutes later, Father ran out of the bedroom and told Mother to call 911 because C.M. was not breathing. Father stated that C.M. had wiggled and made some noise and then stopped. Father saw C.M. was not breathing and Father could not find that he had a pulse. C.M. was without oxygen and/or a pulse for 40 minutes before he regained a pulse. Due to the lack of oxygen, he suffered irreparable brain damage and was placed on life support.

Mother and Father each denied there had been any recent change in C.M.'s behavior or that he had been particularly fussy. Mother stated that two weeks earlier, she had taken C.M. to the hospital because he had "'dots'" on his arm and neck which caused swelling; he received a prescription for antibiotics. Mother and Father denied leaving C.M. with a babysitter or at a daycare; Mother stated she might have left him one or two times with a cousin while she took a shower or ran to the store, without incident. When questioned by a police detective, Mother had no explanation for C.M.'s injuries.[2]

On February 27, 2020, Child Abuse Specialist Dr. Daphne Wong reported that C.M. had no acute fractures but seven fractures in different areas of his body were in

_____

[2] Mother mentioned that Father had once tripped over the dog while holding C.M., which had occurred when Mother was asleep. Child Abuse Specialist Dr. Daphne Wong stated that such an incident would not explain C.M.'s injuries.

6

various stages of healing. She said that the lifesaving measures could not have caused the fractures because none of them was acute but all were in healing stages. She stated C.M.'s multiple rib fractures are "highly suspicious of abuse" and C.M. would have been showing symptoms two to three weeks before he went into cardiac arrest. She stated that the injuries would have been painful.

Dr. Wong stated the transverse fracture of C.M.'s left ulna was likely caused by a direct blow, a "yanking up," or by "pressing hard" on that area. The oblique fracture was consistent with something falling on C.M. or by a twisting/pulling mechanism. The right tibia fracture was likely caused by a twist and pull motion. She stated the injuries could not have been caused at birth because the fractures occurred only two to four weeks earlier. C.M. also had a hematoma on the right side of his head that was consistent with C.M. having suffered a blunt force trauma. Dr. Wong further stated there were no obvious signs of a bone disorder and C.M.'s blood work "c[a]me back negative" and did not shed light on the cause of his injuries.

C.M. was declared brain dead on March 2. A couple of days later, his cardiac death was declared.

Mother and Father each invoked their rights under the Fifth Amendment; Father invoked his Fifth Amendment right "globally" and was thus unavailable to be interviewed regarding the allegations of the case.

A.M. was taken into protective custody and placed with her maternal great-aunt. Mother and Father were provided information on referrals and services to assist with possible reunification.

In an addendum report, the assigned social worker stated that Mother denied ever hurting C.M. and that she did not know how C.M. had received injuries two to four weeks before he was rushed to the hospital. She stated that her own mother had once stayed with C.M. for "like a hot minute."

7

The cause of C.M.'s death was determined in July 2020 to be from a traumatic brain injury; the coroner's report stated it was a homicide.[3]

Dr. Nicole Ellis, the pathologist who performed the autopsy on C.M., testified at the jurisdiction hearing. She testified that she could not give exact dates when C.M.'s fractures occurred but, based on the extent they had healed, the fractures occurred in separate incidents before February 26, 2020; the rib fractures had occurred a couple of weeks to about a month before C.M. had died and the arm fracture had occurred more recently than the rib fractures. She testified that C.M. had died from a head trauma as a result of a battery. Dr. Ellis confirmed C.M. did not have any acute rib fractures that might have been caused by life saving measures.

After the jurisdiction hearing, the juvenile court found by a preponderance of the evidence that A.M. came within section 300(f) and also section 300, subdivisions (a), (b)(1), and (j), and set the matter for a disposition hearing.

## III.

### DISPOSITION REPORTS AND HEARING

In advance of the disposition hearing, SSA filed an addendum report reiterating its recommendation that the juvenile court declare dependency, deny reunification services, and schedule a permanency hearing. SSA reported that Mother and Father were doing well in therapy. Both maintained, however, that C.M.'s injuries must have been caused by medical conditions; they denied having caused his injuries. Neither provided any information regarding who could have injured C.M.

At the disposition hearing, the assigned social worker testified that SSA recommended the court deny reunification services to the parents because of the concern

---

[3] Although there was extensive discussion on the admissibility of the coroner's homicide conclusion, the juvenile court admitted documentary and testimonial evidence of that conclusion. At the jurisdiction hearing, however, the court stated it was not relying on that evidence in its ruling.

for A.M.'s safety in their care given C.M.'s unexplained injuries and death. The social worker testified that Father was the main suspect in the criminal investigation of C.M.'s death and that Mother continued in her relationship with Father. The social worker acknowledged then four-year-old A.M. loved her parents and visitation had been appropriate. She testified the parents had participated in positive therapy sessions and completed parenting and/or child abuse programs. Although neither Mother nor Father had a criminal history or history of domestic violence, neither had taken responsibility for C.M.'s injuries or death.

After the disposition hearing, the court found by clear and convincing evidence that reunification services need not be provided to either Mother or Father based on section 361.5, subdivision (b)(4). The court stated on the record that Mother and Father did not meet their burden of showing that providing reunification services would be in A.M.'s best interests. The court declared A.M. a dependent child of the Orange County Juvenile Court under section 360, subdivision (d). The court then set the matter for a hearing to determine a permanent plan for A.M., under section 366.26. Mother and Father each timely filed a notice of intent to file a writ petition.

## DISCUSSION

### I.

#### THE JURISDICTIONAL FINDING THAT C.M.'S INJURIES AND DEATH WERE CAUSED BY THE PARENTS

In the petitions, Mother and Father each challenge the juvenile court's jurisdictional finding that they caused C.M.'s injuries within the meaning of section 300(f) on the ground it was unsupported by sufficient evidence.

Initially, we note that neither Mother nor Father challenges the juvenile court's assertion of jurisdiction over A.M., pursuant to section 300, subdivision (a), (b)(1), or (j). Dependency jurisdiction may be based on any one ground set forth in

9

section 300. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.) Therefore, even if the parents were correct that there was not substantial evidence to support the juvenile court's jurisdictional findings under section 300(f), we would nevertheless deny the petitions for a writ of mandate on that ground, because the court's jurisdictional findings under section 300, subdivisions (a), (b)(1), and (j) are unchallenged. In any event, for the reasons we explain, substantial evidence supported the juvenile court's jurisdictional finding under section 300(f).

**A.**

### *Standard of Review and Section 300(f)*

We review the portion of the jurisdiction order challenged by the parents to determine whether the findings were supported by substantial evidence. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.) "'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*Ibid.*)

Section 300(f) provides that a child comes within the jurisdiction of the juvenile court, which may adjudge that person to be a dependent child of the court, if "[t]he child's parent or guardian caused the death of another child through abuse or neglect." In *In re Ethan C.* (2012) 54 Cal.4th 610, 640, the Supreme Court addressed the meaning of the word "caused" as it appears in section 300(f): "One's *wrongful acts or omissions* are a legal cause of injury if they were a substantial factor in bringing it about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm.

10

[Citations.] This 'but for' limitation does not apply, however, if the actor's wrongful conduct alone would have produced the harm, even without contribution by other forces. [Citations.] [¶] Nothing in the plain language, or the history, of section 300(f) suggests the Legislature had a more restrictive concept of 'cause[]' in mind for purposes of that statute. Indeed, a recent Court of Appeal decision has concluded that the normal principles of 'substantial factor' causation apply to section 300(f). [Citation.] We find no reason to disagree." (Italics added.)

The Supreme Court clarified that "for purposes of a dependency adjudication under section 300(f), the neglect by which a parent or guardian 'caused the death of another child' may include the parent's or guardian's breach of ordinary care, and need not amount to criminal negligence." (*In re Ethan C., supra*, 54 Cal.4th at p. 637.) Furthermore, a dependency finding under section 300(f) does not require "specific evidence of a nexus between the particular circumstances of the child fatality caused by the parent or guardian and a substantial current risk of harm to living children in that person's custody and care." (*In re Ethan C., supra*, at p. 637.)

**B.**

***The Juvenile Court's Ruling***

At the jurisdiction hearing, the juvenile court found the allegations of the amended petition true by a preponderance of the evidence bringing A.M. within the provision of section 300(f) as well as section 300, subdivisions (a), (b)(1), and (j). As to its finding under section 300(f), the court explained its ruling as follows:

"The petition is alleged as to A[.M.]. And the court is keeping that in mind. But as to the child C[.M.], the court notes that this was a three-month-old infant.

"The court also notes that, specifically, this infant was in the exclusive care of Mother and Father. While there were references to ten minutes or, I think, a hot second, that potentially another family member could have been watching C[.M.], it is very clear from the evidence that this is exclusive care between parents, Mother and

11

Father.  And it may be Mother during the day and Father at night, and it may be variations of that, but that is a specific fact that the court is absolutely relying on.

"The court has heard from and accepted in the evidence from the pathologist as an expert witness as to the cause of death.  The court is accepting the expert witness's testimony in its entirety on the cause of death being blunt force trauma to the head of the child.

"And although the expert Dr. Ellis opined as to it being force, I think that [Father's counsel] articulated with that excluding any possibility of accident.  She had no explanation or no knowledge of an accident that was—at the time that was accepted, but it was not excluded.

"So what we do have is this:  I have evidence of a pattern of injuries, and those injuries are substantial.  The injuries include a broken ulna.  It includes broken ribs, both anterior and frontal ribs that were broken.  Those broken bones on this three-month-old infant are, per the expert, done at significant different periods of time.

"And the expert went forward and articulated that those injuries were in different stages of healing.  In addition, the court finds that there has been no reasonable explanation to those injuries that were sustained while in the care of both Mother and Father.  No medical explanation, no explanation regarding the fall that is consistent with the time frames that were given by the experts of when those injuries occurred.

"So the court is looking at that pattern of injury very specifically in this case because the court is accepting that pattern of injury, meaning, the broken bones at different times during the course of being in the care of the parents, as circumstantial evidence that we'll get to in a moment.

"The other additional piece of information I'm just going to articulate in part for this ruling is that there's also information regarding the infant.  The infant would have been in—I believe the word is 'severe discomfort' that was used—but the testimony

12

from the experts is that the infant would have been in pain and discomfort based on these injuries. And the court is utilizing that information, as well.

"So the legal analysis for the court started with the primary issue of this: If I have two parents, the child is exclusively in the care of those two parents—not only when the child dies of blunt force trauma without an explanation, but also when the child receives multiple broken bones at different times, again, exclusively in the care of the parents—but I don't have the details of whether there's one offending parent; whether there's two offending parents together; or what the actual factual basis would be of the cause of those. The court was looking at this issue of: Does the court need to identify the offending parent in order to go forward with these charges?

"And it's more specific to the (f) count. But the court is looking at this following case and analogizing this case as to all of the potential allegations that are before us. The court . . . is specifically referring to and is noting [*In re E.H.* (2003) 108 Cal.App.4th 659 (*E.H.*)] . . . .

"Along with other cases that we looked at regarding, you know, the level of negligence or what level we were looking at, this case was specific as to the issue about identifying whether there's a need to identify the offending parent as such.

"And this case, the facts are a little different in this case in that there were multiple family members that they were looking at. It's an (e) count, which is not the same count that's before us at this time. But the court went into great length and the Court of Appeal went into great length about the specific issue that we do have, which is the need to identify the offending parent. When, in this case, specifically, again, this is not the same issue where there were multiple parties that were present, it's an unknown issue. This court is finding specifically that this is a known issue; and that it's one parent or the other or both. And that is the only reasonable conclusion that can be drawn from the evidence as provided.

13

"The issue as it was articulated, . . . and I will quote, 'that, furthermore, where there is no identifiable perpetrator, only a cast of suspects, as in this case, jurisdiction under this subdivision (e) is not automatically ruled out.  A finding may be supported by circumstantial evidence, as it is in this particular case,' referencing to *E.H.*—'otherwise'—and this is the issue—'otherwise, a family could stonewall the Department and its social workers concerning the origin of the child's injuries and escape a jurisdictional finding'; in this case, under that specific jurisdictional finding, under (e).

"The court finds this case—this legal theory and this situation very analogous, except for unlike the case that is in *E.H.*, the court only has the parents in this particular situation.  So the court is looking at this as such:  That it is circumstantial evidence on the pattern of injuries while in the care of both parents; that if it is one parent is the perpetrator, then the other parent knew or reasonably should have known; that is as to the (a) and (b) counts.

"As to the (f) count, the court is not identifying the perpetrator, specifically leaving this open to it could be either, both; but both parents are presenting here with evidence that does not in any way give an approximate plausible explanation for these injuries."

## C.

### *Substantial Evidence Showed the Parents Caused C.M.'s Death Within the Meaning of Section 300(f)*

Mother and Father do not argue in their petitions that there is insufficient evidence to support the findings that:  (1) C.M. had been in their sole care and custody throughout his life; (2) no one other than then three-year-old A.M. had lived with them during that period of time; (3) C.M.'s death was caused by traumatic brain injury; (4) C.M. had suffered multiple bone fractures in the weeks leading up to his death which were undetected and untreated; (5) the types of injuries sustained by C.M. were consistent with nonaccidental causes; and (6) neither Mother nor Father provided any

14

information explaining how the injuries C.M. suffered, including his fatal injury, occurred. Indeed, these findings are supported by substantial evidence and are otherwise sufficient to show Mother and Father caused C.M.'s death within the meaning of section 300(f).

In his petition, Father argues insufficient evidence supported the court's finding under section 300(f) that the parents caused C.M.'s death because no evidence showed the precise date, time, place, and manner in which C.M.'s injuries were inflicted. Father cites no authority, and we have found none, that a finding under section 300(f) requires evidence identifying who directly inflicted the injuries on the child, and the time, place, and manner in which those injuries were inflicted.

In *E.H., supra*, 108 Cal.App.4th at pages 669-670, cited by the juvenile court here, the appellate court rejected the contention that a jurisdictional finding under section 300, subdivision (e) required such specificity.[4] In *E.H.* the appellate court stated: "Essentially, the Department employs a 'res ipsa loquitur' type of argument to support a jurisdictional finding under subsection (e). There was severe physical abuse of a child under five (E.'s broken bones) and the child was never out of her parents' custody and remained with a family member at all times; therefore, [the parents] inflicted the abuse or reasonably should have known someone else was inflicting abuse on their child, bringing E. within the language of subsection (e). We agree. In the instant case, the only reasonable conclusion which may be drawn from the evidence is that [the parents] *reasonably* should have known E. was being physically harmed by someone in the house. The infant, pursuant to the admissions of everyone who resided in the house, was never alone. The newborn infant slept on the floor near a bed occupied by a blind,

---

[4] Section 300, subdivision (e) provides that a child is within the jurisdiction of the juvenile court if the child "is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

15

developmentally delayed adult who habitually rolled out of bed and dragged herself around the apartment. The child cried whenever she was handled; having received a diagnosis of likely colic, the parents did nothing to follow up. The only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing E.'s injuries, and that [the parents] *reasonably* should have known (since they lived there) the identity of the perpetrator. Such an argument may be sustained without resorting to the presumption of section 355.1." (*E.H., supra*, at pp. 669-670, fn. omitted.)

The appellate court in *E.H.* also rejected the juvenile court's conclusion that section 300, subdivision (e) required more: "Here, however, the dependency court impliedly concluded that the statute required *actual* knowledge, i.e., direct evidence of abuse. Because [the parents] and other members of their extended family expressly disavowed any knowledge of how E.'s injuries were sustained, the court erroneously concluded they *reasonably* could not have known how those injuries were sustained. This logical leap is unsupportable. Whether [the parents] actually *knew* E. was being injured by someone else is not required by the language of section 300, subdivision (e) or *In re Joshua H.* [(1993) 13 Cal.App.4th 1718]; the only requirement is that they reasonably should have known. Furthermore, where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence as it is here. *Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)*." (*E.H., supra*, 108 Cal.App.4th at p. 670, fourth italics added.)

Although *E.H.* did not involve a jurisdictional finding under section 300(f), its analysis of section 300, subdivision (e) is relevant here. Given the parents' exclusive care and custody of C.M. during the three months of his life and C.M.'s serious and nonaccidental injuries, the facts show that either (1) both Mother and Father inflicted

16

C.M.'s injuries or (2) either Mother or Father inflicted the injuries and the other was necessarily aware of the abuse but failed to anything about it. Father's interpretation of the requirements of section 300(f) under the facts of this case would enable parents who have a child in their sole care and custody to stonewall SSA and its social workers concerning the precise circumstances underlying that child's death and escape a jurisdictional finding under section 300(f). We conclude that is not what the Legislature intended and find no error.

## II.
### THE DENIAL OF REUNIFICATION SERVICES UNDER SECTION 361.5, SUBDIVISION (b)(4)

Father argues insufficient evidence supported the juvenile court's order denying Mother and Father reunification services on the ground they caused C.M.'s death within the meaning of section 361.5, subdivision (b)(4). Mother argues the juvenile court erred when it denied her reunification services because she was not an offending parent. Mother's and Father's arguments are without merit.

### A.

### *Applicable Legal Principles and Standard of Review*

Although reunification services are normally provided to the parents of children declared to be dependents of the juvenile court, section 361.5, subdivision (b) sets forth circumstances under which the juvenile court may deny such services. As is relevant in this case, the statute provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (4) That the parent or guardian of the child has caused the death of another child through abuse or neglect." (§ 361.5, subd. (b)(4).) The reason for this provision is clear: "[W]hen child abuse results in the death of a child, such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child.

17

'The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification.'"  (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 65.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

**B.**

### *The Juvenile Court's Ruling*

At the disposition hearing, the juvenile court denied the parents reunification services under section 361.5, subdivision (b)(4), explaining:  "So now the court is looking at whether or not the bypass under the (b)(4) is allowed; again, if the perpetrator, so to speak, is not named.  And the court looked at the plain language under the (b)(4) statute.  And I believe this was something that was alluded to or actually spoken from [SSA's counsel], that the (b)(4) language is very clear; that the requirement is either the abuse or the neglect, meaning, that under that statute, the parent does not have to be the parent that caused the final abuse; but if the parent was there and continued to be there, not just through the first abuse, not just through the second abuse, but, also, through the final abuse, the court can find that the (b)(4) statute applies.

"And in this case, the court does find that by clear and convincing evidence, the circumstantial evidence supports that each parent, separately, falls within the bypass statute under abuse or neglect; and that while we do not know the distinct

18

action of each parent, we do know that C[.M.] not only died in their care, but sustained substantial injuries in a pattern and over the course of time that started weeks from his birth.

"And with that, the court, again, finds that the bypass statute for failure to protect and for the negligence under that applies to both parents, at a minimum; and that that comes under the abuse or neglect portion of the statute."

## C.

### *Substantial Evidence Supported the Court's Finding that Mother and Father Caused C.M.'s Death by Abuse or Neglect*

Here, substantial evidence also supported the juvenile court's finding by clear and convincing evidence that C.M.'s death was caused by Mother's and Father's abuse or neglect, and that reunification services therefore were not required. The same evidence supporting the juvenile court's section 300(f) jurisdictional finding by a preponderance of the evidence, discussed *ante*, is sufficient to support the "caused the death of another child through abuse or neglect" finding under section 361.5, subdivision (b)(4) by the heightened clear and convincing evidence standard. That evidence was sufficient to enable a reasonable fact finder to find it highly probable that the fact was true. (See *Conservatorship of O.B., supra*, 9 Cal.5th at pp. 995-996.)

Again, that evidence shows C.M. was in the primary and sole custody of Mother and Father when his nonaccidental traumas occurred. Either Mother or Father, or both, caused C.M.'s fatal injury. In addition to the traumatic brain injury, which caused his death in early March of 2020, C.M. was found to have fractured bones in various parts of the body which were in various stages of healing. No reasonable explanations for those injuries were given. Substantial evidence showed that, as a result of the prior incidents in which C.M. suffered fractured bones, he would have suffered pain and yet no medical attention related to such fractures had been sought and no information explaining

19

how such fractures could have gone unnoticed was offered. And yet Mother and Father persisted in asserting that they had no knowledge or information about C.M.'s injuries.

Even if we were to assume Father alone had inflicted C.M.'s injuries, as suggested by Mother in arguing in her petition she was a nonoffending parent, the evidence shows that on one or more occasions before C.M. went into cardiac arrest, C.M. suffered nonaccidental injury causing bone fractures and significant pain. The evidence supports the finding by clear and convincing evidence that, in such a circumstance, Mother had to have known about the abuse but neglected to acknowledge it or respond to C.M.'s injuries and pain during the weeks preceding his fatal traumatic brain injury. The juvenile court did not err by finding not only Father, but also Mother, caused C.M.'s death through abuse or neglect.

The parents' reliance on *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839 is misplaced. In that case, a parent sought review of an order denying reunification services under subdivision (b)(6) of section 361.5, instead of subdivision (b)(4) of that code section. Unlike subdivision (b)(4) at issue here, the bypass of reunification services under subdivision (b)(6) of section 361.5 cannot be based on negligence. The appellate court in *Tyrone W. v. Superior Court* held "[t]he Legislature did not intend subdivision (b)(6) to apply to deny reunification services to a negligent parent; rather, the parent must have been complicit in the deliberate abuse of the child." (*Tyrone W. v. Superior Court, supra*, 151 Cal.App.4th at p. 843.) In contrast, subdivision (b)(4) of section 361.5 expressly provides for the denial of reunification services because a parent caused the death of another child through neglect.

## III.

### THE JUVENILE COURT DID NOT ERR IN DETERMINING THAT REUNIFICATION SERVICES WOULD NOT BE IN A.M.'S BEST INTERESTS

Once the juvenile court made its finding that reunification services were not required, pursuant to section 361.5, subdivision (b)(4), it could only order such services if

it found by clear and convincing evidence that reunification would be in A.M.'s best interests. (§ 361.5, subd. (c)(2).) Both parents argue the juvenile court erred by denying reunification services because reunification was in A.M.'s best interests under section 361.5, subdivision (c)(2).

"It has often been noted that '[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced.' [Citation.] However, . . . 'Once it is determined one of the situations outlined in [section 361.5, ]subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]' Subdivision (b)(4) of section 361.5 evidences the Legislature's recognition that some situations are so extreme as to require extraordinary caution in recognizing and giving weight to the usually desirable objective of family preservation. As noted in *In re Alexis M.* (1997) 54 Cal.App.4th 848, 850-851, when child abuse results in the death of a child, such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child. 'The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification . . . .' [Citation.] [¶] The Legislature has, nevertheless, left open a 'tiny crack' to the parent who has been responsible for the death of his or her child. [Citation.] Subdivision (b)(4) of section 361.5 can be overcome by a showing, made with clear and convincing evidence, that reunification would be in a surviving child's best interest." (*In re Ethan N., supra*, 122 Cal.App.4th at p. 65.) We review the juvenile court's refusal to order reunification services under section 361.5, subdivision (c) for abuse of discretion. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96, fn. 6.)

We find no abuse of discretion by the juvenile court. The court made the following statements on the record at the disposition hearing regarding A.M.'s best interests: "The final issue, then, presented to the court is whether or not the parents have

21

shown that it is in A[.M.]'s best interest to offer reunification services at this time. And I have mentioned the 17 months a number of times[5] because it is a distinction of where we are today. [¶] But going back to our original analysis, you know, the court can't find that those circumstances were ameliorated or changed or addressed if the court never knows exactly what the parents were doing and what actions were taken or not taken. So the court does not have any evidence, again, to support that the actual cause of C[.M.]'s death has been changed. [¶] Again, the court's not going to speculate as to what that cause was, but having addressed parenting skills and having addressed grief or loss does not address what brought on C[.M.]'s death. [¶] So with that, the court, at this time, specifically finds that the best interest of A[.M.], that burden is not met by the parents. So these findings are made specifically—clear and convincing evidence has been brought forth by the County as to the detention and continued detention and removal from the parents under [section] 361[, subdivision] (c). [¶] The court finds that the bypass code under [section] 361.5[, subdivision] (b)(4), that clear and convincing evidence has also been presented as to support that finding; and that the parents have not met their burden under the best interest of the child."

Although Mother and Father produced evidence of completing child abuse and parenting classes and positive visits with A.M., there is no evidence in the record showing that the reasons A.M. and C.M. originally came to the attention of the juvenile court have been addressed. The record is devoid of any explanation as to how C.M., in the sole care and custody of the parents, had been severely injured on more than one occasion culminating in his death. Neither Mother nor Father has taken responsibility for what happened to C.M. and nothing suggests the cause of physical harm to C.M. has been resolved and is not a threat to A.M.

---

5   It had been 17 months since C.M.'s death.

Under those circumstances, the juvenile court was well within its discretion in concluding the parents had not established by clear and convincing evidence that reunification services would be in A.M.'s best interests.

## IV.

### THE JUVENILE COURT DID NOT VIOLATE FATHER'S DUE PROCESS RIGHTS BY ADMITTING A 74-PAGE ADDENDUM REPORT DURING THE JURISDICTION HEARING.

In his petition, Father argues the juvenile court violated his right to due process by admitting a new and lengthy report in the middle of a contested jurisdiction hearing. Father does not describe the contents of the report, or any portion of it that he found to be a surprise or unfair. He does not assert that the report contained any information that was new to him. He also does not argue how the admission of the report prejudiced him.

In its opposition to the petitions, SSA states that "[t]he records attached to the addendum reports were released to Father's counsel months prior. Notwithstanding, the court offered Father a continuance to review the addendum report and subpoena witnesses if necessary, which he declined."

The record shows that at the time the report was offered, the juvenile court offered to continue the jurisdiction hearing and offered Father's counsel "time to subpoena those witnesses, if . . . necessary based on the timing of the reports." The court also found there was no indication "there was any delay or any kind of delay that is in some way a due process issue that we can't address by a continuance." Father's counsel declined the court's offer to continue the jurisdiction hearing.

Father did not file a reply to SSA's opposition. Father has failed to show evidentiary error much less prejudicial error.

23

## DISPOSITION

The petitions for writ of mandate are denied.

FYBEL, ACTING P. J.

WE CONCUR:

GOETHALS, J.

MARKS, J.*

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24